IN THE COURT OF APPEALS OF NORTH CAROLINA

 2021-NCCOA-232

 No. COA20-879

 Filed 1 June 2021

 Alamance County, No. 18 JA 175

 IN THE MATTER OF: K.M.

 Appeal by respondent-mother from order entered 20 August 2020 by Judge

 Fred Wilkins in Alamance County District Court. Heard in the Court of Appeals 27

 April 2021.

 Jamie L. Hamlett for petitioner-appellee Alamance County Department of
 Social Services.

 Administrative Office of the Courts, by GAL Appellate Counsel Matthew D.
 Wunsche, for guardian ad litem.

 J. Thomas Diepenbrock for respondent-appellant mother.

 ZACHARY, Judge.

¶1 Respondent-Mother appeals from the trial court’s order awarding her

 supervised visitation with her son “Kenneth,”1 but temporarily suspending in-person

 visitation due to the closure of the supervised visitation facilities during the COVID-

 19 pandemic. After careful review, we affirm the trial court’s order in part, vacate the

 1 Consistent with the parties’ stipulation and the record on appeal, a pseudonym is

 used to protect the identity of the juvenile in accordance with N.C.R. App. P. 42(b).
 IN RE: K.M.

 2021-NCCOA-232

 Opinion of the Court

 order in part, and remand.

 Background

¶2 Kenneth was born to Respondent-Parents in February 2018. The day after

 Kenneth was born, the Alamance County Department of Social Services (“DSS”)

 received a report that both Kenneth and Respondent-Mother had tested positive for

 marijuana. On 25 September 2018, DSS received a report concerning domestic

 violence between Respondent-Parents and the maternal grandmother; Respondent-

 Mother was arrested for allegedly assaulting her mother in Kenneth’s presence. On

 8 October 2018, DSS received another report, this time regarding substance abuse,

 improper supervision, improper care, and domestic violence. Respondent-Parents and

 the maternal grandmother allegedly consumed marijuana while Kenneth was

 present in the home, and when a social worker and law enforcement officers visited

 the home to investigate, Respondent-Mother locked herself in a bedroom with

 Kenneth and threatened to kill herself. When law enforcement officers intervened,

 Respondent-Mother “engaged in a physical altercation with them.” Respondent-

 Mother was involuntarily committed, and Kenneth was placed in a kinship placement

 with a maternal relative.

¶3 On 12 October 2018, DSS filed a juvenile petition alleging that Kenneth was a

 neglected and dependent juvenile. That same day, the trial court entered an order

 placing Kenneth in nonsecure custody with DSS. DSS, in turn, placed Kenneth with
 IN RE: K.M.

 2021-NCCOA-232

 Opinion of the Court

 a foster family (“the guardians”), rather than continuing the kinship placement,

 because the maternal relative stated that she could no longer care for Kenneth.

 Following a Child and Family Team meeting on 8 November 2018, Respondent-

 Parents agreed to case plans. And on 12 December 2018, Respondent-Parents

 stipulated to certain facts for the purposes of adjudication in this matter, including

 that “it would place [Kenneth] at a substantial risk of physical harm if returned to

 [Respondent-Parents] due to their ongoing mental health, substance abuse, domestic

 violence, lack of ability to provide basic needs and other issues of concern.”

¶4 On 30 December 2018, Respondent-Mother was arrested and charged with the

 misdemeanor simple assault of Respondent-Father. While incarcerated, she was

 charged with felony possession of a controlled substance on jail premises. She

 remained incarcerated until 24 January 2019.

¶5 On 6 January 2019, the trial court entered an order adjudicating Kenneth to

 be a neglected and dependent juvenile, and awarding custody of Kenneth to DSS. The

 trial court also set conditions for Kenneth’s reunification with Respondent-Parents,

 and awarded Respondent-Parents supervised visitation.

¶6 Respondent-Father was arrested on 18 March 2019 for a variety of drug

 possession charges, contributing to the delinquency of a minor, and a probation

 violation. Respondent-Father was also charged with second-degree sexual

 exploitation of a minor and contributing to the delinquency of a minor, allegations
 IN RE: K.M.

 2021-NCCOA-232

 Opinion of the Court

 concerning his 17-year-old girlfriend who lived with him. He was incarcerated until

 22 June 2019, when he was released on post-release supervision and subject to house-

 arrest.

¶7 Following an initial permanency planning hearing on 9 April 2019, the trial

 court endorsed reunification with Respondent-Parents as a primary plan for Kenneth

 with adoption as a secondary plan, but maintained Kenneth’s placement with DSS

 and continued Respondent-Parents’ conditions for reunification.

¶8 On 15 May 2019, Respondent-Mother was arrested for a probation violation.

 On 18 July 2019, she was arrested for shoplifting and concealment of goods. Despite

 this, she consistently attended her supervised visits with Kenneth when she was not

 incarcerated.

¶9 On 6 August 2019, after Respondent-Mother failed to confirm that she would

 attend a visitation with the social worker, the social worker informed Respondent-

 Mother that the visitation would be canceled. Respondent-Mother texted the social

 worker an apology, but when she called the social worker, Respondent-Mother “began

 screaming obscenities at [the social worker,] calling her names such as stupid, fat,

 and bitch.” The social worker ended the call as Respondent-Mother “continued to use

 profanity and was beyond reasoning with as she was screaming childlike into the

 phone.” Respondent-Mother called back and after the social worker restated the

 confirmation process for supervised visitation, Respondent-Mother “again began
 IN RE: K.M.

 2021-NCCOA-232

 Opinion of the Court

 shouting and screaming profanity, calling [the social worker] a f***ing idiot and a

 f***ing bitch.”

¶ 10 Respondent-Mother was arrested again on 13 August 2019, for a variety of

 drug possession charges, and missed her next supervised visitation due to her being

 incarcerated. On 9 September 2019, Respondent-Mother was again arrested, this

 time for injury to personal property, and remained incarcerated until 13 January

 2020.

¶ 11 In the four permanency planning orders filed between June 2019 and February

 2020, the trial court repeatedly found that Respondent-Mother was “somewhat

 actively participating” in her case plan, but noted that she was “not making adequate

 progress within a reasonable period of time[.]” In the February 2020 order, the trial

 court found that Respondent-Father was making adequate progress and conditionally

 allowed him to have unsupervised visitation with Kenneth. However, after

 Respondent-Father tested positive for marijuana on 28 February 2020, the social

 worker was no longer able to say that his home was free of drugs, and Respondent-

 Father was reverted to supervised visitation only.

¶ 12 On 16 March 2020, the Chief Justice of the Supreme Court of North Carolina

 issued an order directing that the majority of district court cases, including this case,

 be continued for 30 days due to the emerging public health threat posed by the

 COVID-19 pandemic. The order was then extended to 1 June 2020, and hearings in
 IN RE: K.M.

 2021-NCCOA-232

 Opinion of the Court

 this case were continued.

¶ 13 On 20 March 2020, the North Carolina Department of Health and Human

 Services directed the State’s Child Protective Services units to “make all efforts to

 cease face-to-face visitation for foster children . . . and [to] transition to electronic

 means.” Respondent-Parents agreed to suspend in-person visitation and engage in

 electronic visitation in the event that the county or state facilities went into lockdown

 due to the pandemic. Before the first scheduled visitation, Guilford County issued a

 stay-at-home order. Respondent-Parents began virtual visits with Kenneth on 28

 March 2020. In-person visitation with Kenneth resumed on 21 May 2020 for

 Respondent-Mother and on 2 June 2020 for Respondent-Father.

¶ 14 The matter came on for hearing before the Honorable Fred Wilkins in

 Alamance County District Court on 22 and 23 July 2020. In an order entered 20

 August 2020, the trial court ordered, inter alia, that Respondent-Mother exercise her

 visitation with Kenneth at a supervised visitation facility, but temporarily suspended

 that in-person visitation due to the closure of the supervised visitation facilities as a

 result of the COVID-19 pandemic:

 6. That [Respondent-Mother] will have monthly visitation
 with [Kenneth] through the Family Abuse Services
 supervised visitation program or another supervised
 visitation program in the Triad that has similar cost
 structure and reasonable driving distance. The visitation
 shall be twice a month for two hours. [Respondent-Mother]
 will contact Family Abuse Services in order to set up an
 IN RE: K.M.

 2021-NCCOA-232

 Opinion of the Court

 intake meeting or a different supervised visitation program
 in the Triad if Family Abuse Services remains closed that
 has similar cost structure and reasonable driving distance.
 The day and time will be based on the availability of the
 program. . . .

 ....

 8. Until the Family Abuse Services supervised visitation
 center re-opens or another supervised visitation program
 is found, [Respondent-Mother]’s face-to-face visitation is
 suspended. [Respondent-Mother] is permitted to have a
 weekly video contact with [Kenneth] for fifteen to thirty
 minutes as [Kenneth]’s attention span will allow,
 supervised by the Guardians.

 In the Family Abuse Services supervised visitation program order, the trial court

 added that Respondent-Mother’s “level of supervision shall include eyes and ears on,

 direct supervision.”

¶ 15 Although the trial court stated at the hearing that the guardians would bear

 the responsibility of paying the costs of supervised visitation, neither the permanency

 planning order, the guardianship short order, nor the Family Abuse Services

 supervised visitation program order—all entered on 20 August 2020—specifically

 addressed the assignment of the cost of the supervised visitation facility. On 18

 September 2020, Respondent-Mother timely filed her notice of appeal from the

 permanency planning order.

 Discussion

¶ 16 On appeal, Respondent-Mother argues that the trial court erred by (1)
 IN RE: K.M.

 2021-NCCOA-232

 Opinion of the Court

 suspending her supervised visitation with Kenneth, and (2) failing to assign the cost

 of supervised visitation to the guardians. After careful review, we affirm that portion

 of the trial court’s order temporarily suspending the supervised visitation. However,

 we vacate the portion of the order relating to payment of the supervised visitation

 facility fee, and remand to the trial court for clarification.

 I. Standard of Review

¶ 17 Our review of a permanency planning order is “limited to whether there is

 competent evidence in the record to support the findings and whether the findings

 support the conclusions of law. The trial court’s findings of fact are conclusive on

 appeal when supported by any competent evidence, even if the evidence could sustain

 contrary findings.” In re J.S., 250 N.C. App. 370, 372, 792 S.E.2d 861, 863 (2016)

 (citation omitted). Unchallenged findings of fact are presumed to be supported by

 competent evidence and are thus binding on appeal. In re S.C.R., 198 N.C. App. 525,

 532, 679 S.E.2d 905, 909, appeal dismissed, 363 N.C. 654, 686 S.E.2d 676 (2009).

¶ 18 “We review a dispositional order only for abuse of discretion. An abuse of

 discretion occurs when the trial court’s ruling is so arbitrary that it could not have

 been the result of a reasoned decision.” In re N.K., ___ N.C. App. ___, ___, 851 S.E.2d

 389, 394 (2020) (citation omitted).

 II. Suspension of Supervised Visitation

¶ 19 Respondent-Mother argues that the trial court erred when it suspended her
 IN RE: K.M.

 2021-NCCOA-232

 Opinion of the Court

 supervised visitation with Kenneth, because that suspension “effectively eliminate[d]

 the very visitation the trial court ordered.” Respondent-Mother further contends that

 “[t]he trial court’s conclusion that it [wa]s contrary to Kenneth’s best interest to have

 face-to-face visitation [wa]s not supported by the trial court’s findings of fact or by

 competent evidence.”

¶ 20 Our Juvenile Code provides:

 An order that removes custody of a juvenile from a parent,
 guardian, or custodian or that continues the juvenile’s
 placement outside the home shall provide for visitation
 that is in the best interests of the juvenile consistent with
 the juvenile’s health and safety, including no visitation.
 The court may specify in the order conditions under which
 visitation may be suspended.

 N.C. Gen. Stat. § 7B-905.1(a) (2019). When a trial court places a juvenile in a

 guardianship, “any order providing for visitation shall specify the minimum

 frequency and length of the visits and whether the visits shall be supervised.” Id.

 § 7B-905.1(c).

¶ 21 In the instant case, Respondent-Mother does not challenge any of the trial

 court’s findings of fact. Instead, Respondent-Mother challenges conclusion of law #19

 and the decretal portions of the order that awarded her with, but then temporarily

 suspended, visitation at a supervised visitation facility. Respondent-Mother argues

 that “[t]he trial court erred when it suspended [her] visitation with her son, when she

 had not forfeited her rights to visitation, and when the evidence [did] not support a
 IN RE: K.M.

 2021-NCCOA-232

 Opinion of the Court

 finding that it was contrary to Kenneth’s best interest to have visitation with his

 mother.”

¶ 22 Conclusion of law #19 reads as follows, with the specific portion that

 Respondent-Mother challenges in italics:

 19. That until Family Abuse Services supervised visitation
 center is operating or another supervised visitation facility
 in the Triad is operating that has similar cost structure and
 reasonable driving distance, it is contrary to the best
 interest of [Kenneth] to have face-to-face visitation with
 [Respondent-Mother]. Until the centers re-open,
 [Respondent-Mother]’s face-to-face visitation is suspended.
 [Respondent-Mother] is permitted to have a weekly video
 contact with [Kenneth] for fifteen to thirty minutes as
 [Kenneth]’s attention span will allow, supervised by the
 Guardians.

¶ 23 The challenged conclusion of law—that face-to-face visitation with

 Respondent-Mother was not in Kenneth’s best interests so long as no appropriate

 supervised visitation facility was open and operating during the COVID-19

 pandemic—is necessarily understood in the full context of the trial court’s order, and

 builds upon two independent determinations: (1) that only a specific, narrowly

 defined supervised visitation with Respondent-Mother would be in Kenneth’s best

 interests; and (2) that the COVID-19 pandemic rendered that specific supervised

 visitation temporarily unavailable.

¶ 24 The trial court explained the first determination in the immediately preceding

 conclusions of law, which Respondent-Mother does not challenge:
 IN RE: K.M.

 2021-NCCOA-232

 Opinion of the Court

 17. That due to [Respondent-Mother]’s volatile and
 uncontrolled temper, inability to comply with the terms
 and conditions of court orders and other issues as outlined
 above, it is contrary to the best interest of [Kenneth],
 inconsistent with the health and safety of [Kenneth] and
 would present a risk of harm to [Kenneth]:

 a. To have unsupervised visitation with [Kenneth];

 b. To have visitation supervised by [the maternal
 grandmother];

 c. To have visitation supervised by the [guardians]; and

 d. To have visitation supervised by anyone who is not
 trained in supervision techniques and strategies.

 18. That [Respondent-Mother] will have visitation
 supervised by Family Abuse Services supervised visitation
 center or another supervised visitation program in the
 Triad that has similar cost structure and reasonable
 driving distance.

 (Emphasis added).

¶ 25 These unchallenged conclusions of law are supported by the trial court’s

 unchallenged finding of fact “[t]hat it would present a risk of harm for the

 [guardians], maternal grandmother or any untrained person to supervise

 [Respondent-Mother]’s visitation due to [her] volatile and uncontrolled behaviors and

 her aversion to individuals who present information/direction contrary to [her]

 desire.” Not only does Respondent-Mother not challenge this finding of fact, but our

 careful review of the record reveals significant support for the trial court’s finding. In

 light of Respondent-Mother’s criminal history and her pattern of abusive behavior
 IN RE: K.M.

 2021-NCCOA-232

 Opinion of the Court

 and hostility toward her assigned social worker, it is apparent that the trial court

 plainly considered—and rejected—alternative forms of visitation and specifically

 concluded that Kenneth’s best interests would be best served by limiting Respondent-

 Mother to visitation at a supervised visitation facility.

¶ 26 The second determination—that the COVID-19 pandemic rendered that

 narrowly defined supervised visitation temporarily unavailable—is supported by the

 trial court’s unchallenged findings of fact. Among these binding findings of fact are

 several that address the effect of the COVID-19 pandemic on Respondent-Mother’s

 visitation with Kenneth:

 76. [Respondent-Mother] participated in her weekly
 visitation from January 14, 2020 — March 17, 2020. All
 parties agreed to temporarily suspend face to face visits due
 to COVID[-]19. These visits took place at [DSS] or a
 mutually agreed upon location such as McDonald’s. These
 visits went well. . . .

 ....

 102. Due to the [COVID]-19 Pandemic, in an effort to protect
 the safety and health of the child in this case, a temporary
 and limited change to the visitation has been agreed to. In
 this case, all parties agree to supervised visits on the
 weekend by the [guardians] at the same level of
 supervision. In the event that all public locations close or
 the state/county goes into lockdown mode, [Respondent-
 Mother] and [Respondent-Father] agree to suspend their
 face-to-face contact and engage in electronic means. These
 would be arranged by the parties. [Respondent-Parents]
 have been advised that they should also consult their
 attorneys in this matter. Prior to the first supervised face-
 IN RE: K.M.

 2021-NCCOA-232

 Opinion of the Court

 to-face visit by the [guardians], Guilford County issued a
 stay at home order. [Respondent-Parents] began virtual
 visits with [Kenneth] on March 28, 2020.

 103. The [guardians] reported that the virtual visits were
 a challenge. They were a challenge because it was
 sometimes difficult to get [Kenneth] to get on the phone as
 he is two and his attention span is not very long. The other
 challenge that they faced was when [Respondent-Parents]
 were not ready for the visits. For example, they would call
 [Respondent-Mother] and she would be asleep and would
 ask if she could get up and get it together and call them
 back. There were times that [Respondent-Father] would
 not answer and would call back an hour or so later. The
 [guardians] found that driving [Kenneth] around in the car
 while he spoke with [Respondent-Parents] was the best
 way to get him to focus on them.

 104. The face-to-face visits began again on May 21, 2020
 for [Respondent-Mother] and June 2, 2020 for
 [Respondent-Father]. The visits have gone well.

 ....

 121. Family Abuse Services of Alamance County operates
 a supervised visitation center that is not currently
 operating and no date for re-opening has been set. . . .

 ....

 125. That due to the pandemic, the visitation center is not
 currently conducting visitation and has not stated when it
 will reopen.

 (Emphases added).

¶ 27 These findings of fact not only support the trial court’s conclusions, but also

 provide necessary context. The parties agreed to temporarily suspend face-to-face
 IN RE: K.M.

 2021-NCCOA-232

 Opinion of the Court

 visitation at the onset of the pandemic. Indeed, these initial suspensions proved to be

 temporary, in that face-to-face visitation resumed after a few months. The limited

 and temporary nature of the suspension in the order before us is further reflected in

 the reasonable limitations that the trial court explicitly placed on the suspension: it

 would last only until the supervised visitation facility reopened, or until the parties

 located an open and adequate supervised visitation facility in the area.

¶ 28 With the supervised visitation facility temporarily closed due to the COVID-19

 pandemic, the trial court was faced with determining whether it was in Kenneth’s

 best interests either to temporarily suspend Respondent-Mother’s supervised

 visitation, or to award Respondent-Mother an alternative form of visitation that the

 court had already determined was not in Kenneth’s best interests. The trial court

 chose to grant Respondent-Mother the narrowly defined supervised visitation that

 would be in Kenneth’s best interests, and then to temporarily suspend that

 supervised visitation until such visitation became available and safe.

¶ 29 Respondent-Mother cites In re T.R.T., 225 N.C. App. 567, 572–75, 737 S.E.2d

 823, 828–29 (2013), in support of her argument that the trial court’s suspension of

 supervised visitation violated N.C. Gen. Stat. § 50-13.2(e), which provides, inter alia:

 “Electronic communication may not be used as a replacement or substitution for

 custody or visitation.” In T.R.T., this Court reversed and remanded a visitation order

 that provided the respondent-mother with Skype visitation, which we determined
 IN RE: K.M.

 2021-NCCOA-232

 Opinion of the Court

 was “not visitation as contemplated by N.C. Gen. Stat. § 7B-905(c)[.]”2 225 N.C. App.

 at 573, 737 S.E.2d at 828. However, unlike the case before us, in T.R.T., “the trial

 court did not make any specific findings that . . . visitation would be inappropriate

 under the circumstances.” Id. at 574, 737 S.E.2d at 829. Here, the trial court did

 make specific findings that visitation would be inappropriate, with the sole exception

 of supervised visitation at Family Abuse Services, which was temporarily closed due

 to the COVID-19 pandemic.

¶ 30 Further, the trial court’s temporary suspension of supervised visitation in this

 case does not amount to “a replacement or substitution for . . . visitation.” N.C. Gen.

 Stat. § 50-13.2(e). Rather, the trial court exercised its statutory authority to “specify

 in the order conditions under which visitation may be suspended.” Id. § 7B-905.1(a).

 Indeed, the trial court’s order repeatedly describes Respondent-Mother’s supervised

 visitation as “suspended,” rather than “replaced” or “substituted” with weekly video

 contact.

¶ 31 The trial court appropriately provided Respondent-Mother with a contingency,

 depending on the availability of the specific form of supervised visitation that the

 court deemed to be in Kenneth’s best interests. Having determined that other forms

 2 Our General Assembly repealed the relevant portion of § 7B-905(c) in 2013 and

 substantively recodified it as § 7B-905.1(a). 2013 N.C. Sess. Laws 305, 316, ch. 129, §§ 23–
 24.
 IN RE: K.M.

 2021-NCCOA-232

 Opinion of the Court

 of visitation were not in Kenneth’s best interests, and having determined that the

 sole form of appropriate visitation was temporarily unavailable, the trial court could

 have properly awarded Respondent-Mother with “no visitation” at all. Id. However,

 in its discretion, the trial court concluded that it was preferable to temporarily award

 Respondent-Mother weekly video contact for so long as in-person visitation was

 unavailable due to the pandemic.

¶ 32 The trial court’s reasoning is further reflected in the transcript of the hearing.

 First, the trial court modified DSS’s recommended visitation order, with respect to

 ensuring Respondent-Mother’s sobriety:

 THE COURT: The Court’s inclined to go along with
 the recommendations of the department in this matter, but
 I do think that the visitation schedule needs to be modified
 a little bit, particularly with respect to [Respondent-
 Mother].

 I don’t think that the foster parents in the role of
 guardians should be put to the task each visit to determine
 her sobriety or her mental state on this, and from all the
 evidence that I have heard here over the last two days, it
 needs someone else that’s more acutely attuned to making
 those types of decisions should do it.

 And I don’t think it should be a matter of concern. I
 think it should be: if she appears under the influence of
 alcohol or mind-altering drug[s] or if she appears in an
 agitated state for the visitation, that the visitation is
 terminated, and I think that should be done by a third
 party, not by the guardians because, eventually, that is or
 will come back in court.

 ....
 IN RE: K.M.

 2021-NCCOA-232

 Opinion of the Court

 So the visitation schedule is set by [DSS] on this will
 be modified on this to not include[ ] the terms “concern” but
 would be “appear at a visit.”

 And those visits with respect to [Respondent-
 Mother]—I can’t remember the name of the facility here.

 [COUNSEL FOR DSS]: Your Honor, the supervised
 visitation is done through the Family Abuse Services at the
 Family Justice Center. Right now, due to COVID[-19], they
 are not operating or conducting visits, and I don’t know
 when they will start back.

 THE COURT: That’s that way it needs to be done.

¶ 33 Then, after addressing assessment of the supervised visitation facility fee,

 Respondent-Mother’s counsel objected to the visitation order. As described below, the

 trial court considered—and rejected—the alternative option of awarding Respondent-

 Mother supervised visitation at DSS:

 [RESPONDENT-MOTHER’S COUNSEL]: And,
 Your Honor, I would like to just put my objection on the
 record.

 THE COURT: I understand. I understand.

 [RESPONDENT-MOTHER’S COUNSEL]: That,
 number one, my client [lives] an hour away from Family
 Abuse Services, but Family Abuse Services has suspended
 all their supervised visitation. They do not have a plan of
 when they’re going to start it back up, and it has not
 started back up, so it’s not a viable option.

 THE COURT: Well, then—then the alternative is to
 have those visitations occur at DSS and be monitored by
 them, but I don’t want the guardians being placed in the
 position of having to deal with this lady under those
 IN RE: K.M.

 2021-NCCOA-232

 Opinion of the Court

 conditions. I think that’s—I think that’s dangerous to all the
 parties and the child.

 (Emphasis added).

¶ 34 Respondent-Mother characterizes this exchange as a recognition by the trial

 court that there existed “an alternative to suspending visitation while FAS was

 closed[.]” That argument, however, ignores that the trial court clearly considered that

 option and nevertheless rejected it, determining that having Respondent-Mother’s

 visitation supervised at DSS would not be “in the best interests of [Kenneth]

 consistent with [his] health and safety[.]” Id.

¶ 35 After careful review of the record, and due to the specific circumstances at the

 time, we cannot say that the trial court’s decision was not supported by its findings

 of fact or conclusions of law, nor can we say that it was “so arbitrary that it could not

 have been the result of a reasoned decision.” N.K., ___ N.C. App. at ___, 851 S.E.2d

 at 394. The trial court’s award and temporary suspension of Respondent-Mother’s

 supervised visitation with Kenneth is affirmed.

 III. Costs of Supervised Visitation

¶ 36 Respondent-Mother next argues, and DSS and the guardian ad litem agree,

 that the trial court erred when it failed to order that the guardians be responsible for

 the supervised visitation facility fee, as the court indicated at the conclusion of the

 hearing.
 IN RE: K.M.

 2021-NCCOA-232

 Opinion of the Court

¶ 37 In the trial court’s written order, the court determined that it could not “find

 that [Respondent-Mother] has the ability to pay the fees associated with the center[,]”

 and that the guardians “have the ability to pay the fees associated with supervised

 visitation.” However, although the trial court clearly indicated at the hearing that

 the guardians would bear the costs of the supervised visitation facility, the court

 failed to assign the costs in the order that it ultimately entered.

¶ 38 We have vacated and remanded permanency planning orders when “the trial

 court made no findings as to the costs associated with supervised visitation, who

 would bear the responsibility of paying such costs, or [the r]espondent’s ability to pay

 the costs.” In re J.T.S., 268 N.C. App. 61, 74, 834 S.E.2d 637, 646 (2019); accord In re

 Y.I., 262 N.C. App. 575, 582, 822 S.E.2d 501, 505–06 (2018).

¶ 39 Here, the trial court erred by failing to assign responsibility for the costs of

 supervised visitation in its order. Accordingly, “we vacate this portion of the order

 and remand to the trial court for clear instructions” with regard to the assessment of

 the supervised visitation costs. J.T.S., 268 N.C. App. at 75, 834 S.E.2d at 647.

 Conclusion

¶ 40 For the foregoing reasons, the trial court did not abuse its discretion in

 awarding, then temporarily suspending, Respondent-Mother’s visitation at a

 supervised visitation facility that was temporarily closed due to the COVID-19

 pandemic. However, the order is vacated and remanded for the entry of an order
 IN RE: K.M.

 2021-NCCOA-232

 Opinion of the Court

assigning responsibility for the costs of the supervised visitation.

 AFFIRMED IN PART; VACATED IN PART AND REMANDED.

 Chief Judge STROUD and Judge TYSON concur.